USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 01/16/2018

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------- X
UNITED STATES OF AMERICA,          :
                                   :
            Plaintiff,             :
                                   :
    -against-                      :  No. 14 Civ. 7339 (JFK)
                                   :  **OPINION & ORDER**
HASAN BESNELI and                  :
SABA, INC.,                        :
                                   :
            Defendants.            :
------------------------------- X

APPEARANCES
FOR PLAINTIFF UNITED STATES OF AMERICA
    Cristine Irvin Phillips
    Li Yu

FOR DEFENDANT HASAN BESNELI
    Pro se

**JOHN F. KEENAN, United States District Judge:**

    Before the Court is Hasan Besneli's motion to dismiss the Government's complaint, which seeks a civil penalty against Besneli under 12 U.S.C. § 1833a for alleged violations of 18 U.S.C. §§ 1341 and 1343. Construing Besneli's pro se motion to raise the strongest arguments that it suggests, the Court has determined that the grounds for Besneli's motion are lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). For the reasons below, the Court concludes that the Government's complaint does not establish a prima facie showing of personal

1

jurisdiction and, accordingly, grants Besneli's motion to dismiss.

## I. Background

### A. Factual Background

Besneli is a Turkish citizen residing in Istanbul, Turkey. (Compl. ¶ 10, ECF No. 1 (filed Sept. 10, 2014).) From 2003 until at least 2010, Besneli served as an agent for SABA, Inc. ("SABA"), a business incorporated and headquartered in Tennessee that operates as an exporter of U.S.-made goods. (Id. ¶¶ 9-10.)

In early 2003, Besneli, on behalf of SABA, negotiated an agreement with Basbakani Baskanliginda Darussafaka Cemiyeti ("Darussafaka"), a non-profit organization located in Istanbul. (Id. ¶¶ 1, 11.) Besneli agreed to act on Darussafaka's behalf to procure a loan and loan guarantee for the completion of several construction projects in Istanbul and Urla, Turkey (collectively, the "Urla Project"). (Id. ¶¶ 2, 29.) SABA was to act as exporter for all U.S. goods purchased with loan funds in connection with the Urla Project. (Id. ¶ 29.)

Jennifer Windus, who performed work for Besneli, SABA, and Darussafaka, prepared the loan and guarantee applications, respectively, in connection with the Urla Project. (Id. ¶¶ 14, 30.) Ultimately, Darussafaka obtained a loan from Deutsche Bank's branch office in New York ("Deutsche Bank"). (Id. ¶ 13.) On March 17, 2004, Deutsche Bank, Darussafaka, and the Export-

Import Bank of the United States (the "Ex-Im Bank") entered into a credit agreement and Darussafaka signed a promissory note for an amount in excess of $38 million. (Id. ¶ 35.)  The complaint does not specify who signed the credit agreement or promissory note on Darussafaka's behalf.

The Ex-Im Bank is the official export credit agency of the United States. (Id. ¶ 16.)  It offers loan guarantees to foreign entities that wish to use loan funds to purchase U.S.-made goods. (Id. ¶ 17.)  In determining whether to guarantee a loan, the Ex-Im Bank relies upon the application by or on behalf of a foreign borrower as well as all relevant contractual agreements. (Id. ¶ 21.)  In the event that a borrower defaults, the lender has the right to make a claim to the Ex-Im Bank for the unpaid loan funds that are the subject of the guarantee. (Id. ¶ 22.)

To fulfill its statutory mission of maintaining or increasing employment of U.S. workers, see 12 U.S.C. § 635(a)(1), the Ex-Im Bank places various conditions on its loan guarantees. (Compl. ¶¶ 18-19.)  Two such conditions are relevant here.  First, during the time period of the Urla Project, no more than 15 percent of loan funds could be used by a borrower for "local costs," including labor costs and the cost of materials not made in the United States. (Id. ¶ 18.)  Second, a borrower must provide a 15 percent down payment "towards the

total cost of all U.S.-made goods purchased." (Id. ¶ 20 (citing 12 U.S.C. § 635(a)(2).)

Here, to comply with the Ex-Im Bank's requirements, under the proposed loan terms: (1) SABA would use $28.8 million of the loan funds to purchase U.S.-made goods that SABA would export to Darussafaka, and (2) approximately $5 million in loan funds would be available for local construction costs in Turkey. (Id. ¶ 31.) Additionally, in connection with the loan guarantee application submitted to the Ex-Im Bank, SABA included a Construction and Procurement Agreement ("CPA") executed by SABA and Darussafaka. (Id. ¶¶ 32-33.) The CPA was signed by Besneli as Vice President of SABA and provided that Darussafaka would pay a down payment of 15 percent to SABA. (Id.) The complaint does not specify who signed the CPA on Darussafaka's behalf.

The Government claims that SABA, Besneli, and Darussafaka did not adhere to the proposed terms above, but rather conspired to circumvent the Ex-Im Bank's requirements. At the first step of the alleged scheme, SABA marked up the price of the U.S. goods it purchased and exported to Darussafaka, resulting in the expenditure of $28.8 million in loan funds for goods worth only $16 million. (Id. ¶ 40.) Besneli allegedly was aware of and participated in the marking up of goods. (Id. ¶ 41.) Then, the extra funds generated through this strategy were deployed in two ways. First, Besneli, acting through a separate business

4

entity,[1] channeled some of the funds to Darussafaka through payments characterized as donations so as to skirt the Ex-Im Bank's restriction limiting the availability of loan funds for local costs to 15 percent. (Id. ¶¶ 47-52.)  Second, SABA used some of the funds to make the required down payment, sidestepping the requirement that Darussafaka, as borrower, provide the money for a down payment. (Id. ¶¶ 54-61.)  The Government further contends that SABA ceded its responsibility to provide progress reports to an individual named Unver Orer, who, "with SABA and Besneli's knowledge," signed progress reports containing inaccurate information to induce Deutsche Bank to disburse loan funds. (Id. ¶¶ 62-67.)

On April 20, 2007, Darussafaka defaulted after making one interest payment. (Id. ¶ 71.)  On September 13, 2007, Deutsche Bank submitted a claim to the Ex-Im Bank for payment on the loan guarantee. (Id. ¶ 72.)  The Ex-Im Bank ultimately paid the full amount of the loan, plus accrued interest, totaling more than $39 million. (Id.)

**B. Procedural History**

The Government filed the complaint in this matter on September 10, 2014, naming Besneli and SABA as defendants in the alleged scheme to defraud Deutsche Bank and the Ex-Im Bank.

---

[1] That is, Bolzano Ltd., a "now-defunct shell company" owned and operated by Besneli. (Compl. ¶ 12.)

5

Shortly thereafter, the Government and SABA reached a settlement and SABA was dismissed from the suit. (See Stipulation and Order of Settlement and Dismissal, ECF No. 4 (filed Sept. 17, 2014); Consent Judgment, ECF No. 5 (filed Sept. 22, 2014).) The settlement, however, did not resolve the Government's claims against Besneli.

Being unable to locate Besneli, the Government requested and received the Court's permission to serve Besneli by email and publication in Istanbul. (See Op. & Order, ECF No. 13 (filed Aug. 12, 2015); Order, ECF No. 15 (filed Nov. 12, 2015).) The Government effected service via email on December 4, 2015 and via publication throughout December 2015 and January 2016. (Gov. Mem. of L. in Opp'n at 6, ECF No. 20 (filed June 6, 2016).) On January 8, 2016, the Government received a communication from Besneli styled as a "response" to the complaint. (See Endorsed Letter from Cristine Irvin Phillips to Hon. John F. Keenan at 1, ECF No. 17 (filed Apr. 28, 2016).) In light of Besneli's pro se status, the Court liberally construed Besneli's response as a motion to dismiss. (Id. at 2.) After submitting its opposition to Besneli's pro se motion, the Government received Besneli's reply, which it filed as an attachment to a letter to the Court. (Letter from Cristine Irvin Phillips to Hon. John F. Keenan Ex. A, ECF No. 22-1 (filed Aug. 5, 2016).)

## II. Discussion

Because Besneli is appearing pro se, the Court construes his submissions liberally and interprets them to raise the strongest arguments that they suggest. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam). Among other contentions, Besneli asserts that he did not visit the United States in connection with the Project Urla loan application or guarantee and that Turkey is the proper place of jurisdiction pursuant to "international legal practices." The Court construes Besneli's arguments as an objection to this suit on the ground of lack of personal jurisdiction under Rule 12(b)(2). Relying on § 302(a)(1) of New York's Civil Practice Law, the Government contends that the Court has jurisdiction over Besneli because "a court may exercise personal jurisdiction over any non-domiciliary" who "in person or through an agent" transacts "any business within" the state of New York.

### A. Applicable Law

"On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), 'the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant.'" Elsevier, Inc. v. Grossman, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015) (quoting DiStefano v. Carozzi N. Am. Inc., 286 F.3d 81, 84 (2d Cir. 2001)). "In order to survive a motion to

7

dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 167 (2d Cir. 2013) (quoting Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006)). "All jurisdictional allegations 'are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]'" Elsevier, 77 F. Supp. 3d at 341 (quoting A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993)). However, the Court will not "draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59 (2d Cir. 2012) (internal quotation marks and citations omitted).

"Determining personal jurisdiction over a foreign defendant in a federal-question case . . . requires a two-step inquiry." Licci, 732 F.3d at 168. First, the Court applies the forum state's long-arm statute. See Eades v. Kennedy, PC Law Offices, 799 F.3d 161, 168 (2d Cir. 2015). Then, if the long-arm statute permits personal jurisdiction, the Court must analyze "whether personal jurisdiction comports with due process protections established under the Constitution." Id. (citing Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163-64 (2d Cir. 2010)).

**B. Analysis**

"To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." Licci, 732 F.3d at 168 (quoting Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006)). "[P]roof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York," so long as the defendant's activities in New York were "purposeful." Chloé, 616 F.3d at 170 (quoting Kreutter v. McFadden Oil Corp., 522 N.E.2d 40, 43 (N.Y. 1988)). "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Eades, 799 F.3d at 168 (quoting Fischbarg v. Doucet, 880 N.E.2d 22, 26 (N.Y. 2007)).

With regard to Besneli, the Government's jurisdictional allegations primarily rest on the acts of his purported agents, Windus and Orer. For example, Windus, who "performed work for Besneli and SABA," allegedly prepared the loan application for Deutsche Bank, whose New York office extended the loan. (Compl. ¶¶ 13, 14.) Windus, "acting as agent for SABA and on behalf of Darussafaka," also prepared the application for the Ex-Im Bank's

9

guarantee. (Id. ¶¶ 14, 30.)  Once the loan was approved and guaranteed, Orer, "who worked for Besneli in Turkey," allegedly provided false information to Deutsche Bank regarding the progress of the construction project, which led to Deutsche Bank's disbursement of millions of dollars in loan funds. (Id. ¶¶ 66-67; see also Gov. Mem. of L. in Opp'n at 5.)

N.Y. C.P.L.R. § 302(a)(1) provides for jurisdiction over a non-domiciliary defendant who "in person or through an agent . . . transacts any business within the state" of New York.  "In determining whether an agency exists under § 302, courts have focused on the realities of the relationship in question rather than the formalities of agency law." CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 366 (2d Cir. 1986).  "To be considered an agent for jurisdictional purposes, the alleged agent must have acted in the state 'for the benefit of, and with the knowledge and consent of' the non-resident principal." Id. (quoting Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981)).  "Some courts have also required the principal to exercise 'some control' over the agent." Bluestone Capital Partners, L.P. v. MGR Funds Ltd., No. 98 CIV. 3128(WHP), 1999 WL 322658, at *2 (S.D.N.Y. May 20, 1999).

Even assuming that Windus and Orer are Besneli's agents for the purpose of establishing personal jurisdiction, the Government fails to show that the Court's exercise of personal

10

jurisdiction over Besneli would be proper. The Second Circuit has instructed that "[s]everal factors should be considered in determining whether an out-of-state defendant transacts business in New York[.]" Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004). The factors include:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

Id. (quoting Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)). In analyzing whether a defendant has transacted business in New York, the Court looks to "the totality of the defendant's activities within the forum." Continental Indus. Grp., Inc. v. Equate Petrochemical Co., 568 F. App'x 768, 770 (2d Cir. 2014) (quoting Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007)).

With respect to the first factor, the Government has not alleged, nor proffered evidence, that either Deutsche Bank or the Ex-Im Bank is a "New York corporation." According to the complaint, "Deutsche Bank is a German financial institution with a branch in New York, New York," and the New York branch is the

11

entity that extended the loan. (Compl. ¶ 13.)  That the relevant branch is physically located in New York does not mean that Deutsche Bank is incorporated in New York. See Walden v. Lorcom Techs., Inc., No. 05-CV-3600 (KAM)(RER), 2009 WL 799955, at *6 (E.D.N.Y. Mar. 24, 2009) ("For the purposes of jurisdiction, a 'New York corporation' is one that is incorporated in New York.")  Meanwhile, the complaint refers at one point to the "Export-Import Bank of the United States," but contains no allegations regarding the Ex-Im Bank's physical location. (Compl. ¶ 1.)  Accordingly, the Government has not shown that Besneli, through his alleged agents, engaged in "an on-going contractual relationship with a New York corporation" and the first factor weighs against finding that he transacted business in New York.

The Government also fails to show that any negotiation of relevant agreements took place in New York, or that Besneli or his agents visited New York in connection with the loan or guarantee for the Urla Project.  Windus, who allegedly prepared the applications for the loan and guarantee, resides in Washington, D.C., and is not alleged to have traveled to New York. (Compl. ¶¶ 14, 30.)  Neither did Orer, "who worked for Besneli in Turkey" and allegedly provided false information to induce Deutsche Bank's disbursement of millions of dollars in loan funds. (Id. ¶¶ 66-67; see also Gov. Mem. of L. in Opp'n at

12

5.)  The manner in which Besneli's alleged agents communicated with Deutsche Bank and the Ex-Im Bank—i.e., via phone, electronic means, or mail—regarding the loan and loan guarantee simply is not described in the complaint.  Moreover, the Government does not claim that Besneli ever visited New York and Besneli asserts that he did not.  Accordingly, the second factor also weighs against finding that Besneli transacted business in New York.

The Government fares no better with respect to the third and fourth factors.  The complaint contains no allegations concerning a choice-of-law provision in any document related to the loan or guarantee for the Urla Project.  See Sunward Elecs., 362 F.3d at 23 ("A choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law.").  Nor does the complaint clearly allege that Besneli (or the parties to whom he was allegedly connected) was required to send notices of any kind into New York or was subject to supervision in New York.

In fact, the complaint is devoid of specific allegations characterizing negotiations and loan terms that other courts have emphasized in analyzing whether a defendant has transacted business under § 302(a)(1).  See, e.g., Letom Mgmt. Inc. v. Centaur Gaming, LLC, 17 Civ. 3793 (PAE), 2017 WL 4877426, at *6-

13

8 (S.D.N.Y. Oct. 27, 2017) (non-domiciliary defendant did not transact business in New York where, among other things, initial meeting took place outside New York, further negotiations occurred exclusively via email and telephone, and the parties chose Indiana, not New York, law); N.Y. Islanders Hockey Club, LLP v. Comerica Bank-Texas, 71 F. Supp. 2d 108, 114 (E.D.N.Y. 1999) (non-domiciliary defendant transacted business in New York where credit agreement was governed by New York law and obligated defendant "to provide documents and notices to its co-lenders, including other New York banks," and defendant made "several telephone calls into New York . . . concerning the funding of the purchase"); Catalyst Energy Dev. Corp. v. Iron Mountain Mines, Inc., 630 F. Supp. 1314, 1317 (S.D.N.Y. 1986) (non-domiciliary defendant transacted business in New York where parties executed promissory note that was "made payable in New York" and "was to be governed and construed in accordance with New York law," and "defendant directed telephone and written communications to New York in connection with the making of the note").

The Government relies on several other cases that contain important distinctions from the instant matter. For example, in Bluestone Capital Partners, the plaintiff was a New York corporation and the non-domiciliary defendant had "conducted, accepted, and paid for twenty-two transactions in ten different

14

securities" through a securities account in New York. 1999 WL 322658, at *1-4.  As noted above, in N.Y. Islanders Hockey Club, the plaintiff was a New York limited partnership, and the relevant credit agreement was governed by New York law and obligated the non-domiciliary defendant "to provide documents and notices to its co-lenders, including other New York banks." 71 F. Supp. 2d at 114.  The quality of the defendants' New York contacts in these cases presents a more adequate basis for exercising jurisdiction under § 302(a)(1) than what the Government has alleged here. See Letom Mgmt. Inc., 2017 WL 4877426, at *5 ("The Court's primary consideration is '[t]he quality of the defendants' New York contacts.'" (quoting Fischbarg, 880 N.E.2d at 26)).

The Government also asserts that the Court may exercise jurisdiction over Besneli on a conspiracy-based theory.  "It is settled that co-conspirators may be considered 'agents' for establishing personal jurisdiction under Section 302(a)." Sea Trade Maritime Corp. v. Coutsodontis, No. 09 Civ 488(BSJ)(HBP), 2012 WL 3594288, at *7 (S.D.N.Y. Aug. 16, 2012).  However, in cases where courts have considered conspiracy-based jurisdiction over a non-domiciliary defendant, jurisdiction over the alleged co-conspirator has usually been premised on § 302(a)(2), which requires the commission of a tortious act within the state of New York. See, e.g., Related Companies, L.P. v. Ruthling, 17-CV-

15

4175, 2017 WL 6507759, at *12-14 (S.D.N.Y. Dec. 18, 2017) (analyzing conspiracy-based theory of jurisdiction over non-domiciliary defendant under § 302(a)(2)); Emerald Asset Advisors, LLC v. Schaffer, 895 F. Supp. 2d 418, 430-34 (E.D.N.Y. 2012) (exercising jurisdiction over non-domiciliary defendant under § 302(a)(2) where plaintiff adequately alleged conspiracy involving separate defendant who committed tortious acts in New York); Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc., 10 F. Supp. 2d 334, 341-42 (S.D.N.Y. 1998) (finding conspiracy-based theory of jurisdiction under § 302(a)(1) "inapplicable" and stating that "conspiracy-based jurisdiction is more properly based on § 302(a)(2)").

The Government does not contend that § 302(a)(2) is applicable here, however, and its brief refers to only one instance in which a court relying on § 302(a)(1) exercised conspiracy—based jurisdiction over a non-domiciliary defendant. Significantly, in Foremost Guaranty Corp. v. Public Equities Corp., the court began by analyzing whether a non-domiciliary co-conspirator had transacted business in New York. No. 86 CIV. 6421 (CSH), 1988 WL 125667, at *3 & n.6 (S.D.N.Y. Nov. 10, 1988). Based on the co-conspirator's appearance in New York to meet with officials of a New York corporation and the co-conspirator's mailing of several packages to New York in connection with a transaction to purchase a mortgage, the court

16

concluded that the co-conspirator had transacted business in New York and, thus, jurisdiction could be had under § 302(a)(1). Id. The court proceeded to find that exercising conspiracy-based jurisdiction over other non-domiciliary defendants was appropriate. Id. at *3-4.

Here, to be sure, the Government alleges that Besneli participated in a conspiracy, (see Gov. Mem. of L. in Opp'n at 9-10), but its jurisdictional allegations with respect to his co-conspirator (i.e., SABA) are less persuasive than the allegations in Foremost.  Moreover, the Government's conspiracy-based theory of jurisdiction suffers from the same weaknesses as its agency-based theory premised on the actions of Windus and Orer.  That is, the complaint does not contain adequate jurisdictional allegations regarding:  (1) the status of Deutsche Bank or the Ex-Im Bank, respectively, as a New York corporation; (2) where the loan or guarantee was negotiated or executed; (3) the existence of a choice of law provision in any relevant agreement; or (4) any obligation attributable to Besneli to send notices into New York or be subject to supervision in New York. See Sunward Elecs., 362 F.3d at 22 (listing factors to be considered under § 302(a)(1)).  Accordingly, the Court finds that exercising jurisdiction over Besneli on a conspiracy-based theory would not be appropriate.

In sum, considering the totality of the circumstances, the Government has not made a prima facie showing of personal jurisdiction over Besneli pursuant to § 302(a)(1).

## Conclusion

For the reasons above, Besneli's motion to dismiss the complaint for lack of personal jurisdiction is GRANTED. In light of the Court's conclusion, it is not necessary to address whether a jurisdictional finding in this matter would satisfy due process or Besneli's arguments to dismiss this action for failure to state a claim upon which relief can be granted.

If the Government wishes to amend the complaint, it shall move this Court to do so no later than 30 days from the date of this Opinion. Otherwise the Court will enter an order closing the case.

**SO ORDERED.**

Dated: New York, New York
January 16, 2018

*John F. Keenan*
John F. Keenan
United States District Judge